UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| RACHEL K.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:20 CV 1752 JMB |
| | ) |
| KILOLO KIJAKAZI, | ) |
| Acting Commissioner of the Social | ) |
| Security Administration,[2] | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

**I. Procedural History**

On September 18, 2018, plaintiff Rachel K. filed an application for a period of disability and disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq*. (Tr. 265-266). On September 21, 2018, she applied for supplemental security income, Title XVI, 42 U.S.C. §§ 1381, *et* seq. (Tr. 269-278). In both applications, she alleged that she became disabled on November 3, 2017, because of various conditions including fibromyalgia, vertigo, arthritis, anxiety, and depression. (Tr. 270). After plaintiff's applications were denied on initial consideration (Tr. 169-188), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 198-199).

---

[1] In the administrative records before the Court, plaintiff's first name is listed as Rachelabigail. However, the complaint and pleadings in this case lists her first name as Rachel.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rule of Civil Procedure 25(d), Kilolo Kijakazi substitutes Andrew Saul as a defendant in this matter.

Plaintiff and counsel appeared for a hearing on January 27, 2020 before the ALJ. (Tr. 247, 135-168). Plaintiff testified concerning her disability, daily activities, functional limitations, and past work. The ALJ also received testimony from vocational expert Delores Gonzalez, M.Ed. The ALJ issued a decision denying plaintiff's applications on March 30, 2020. (Tr. 46-478). The Appeals Council denied plaintiff's request for review on October 19, 2020. (Tr. 1-4). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A.  Disability and Function Reports and Hearing Testimony

Plaintiff was born in February, 1975 and was 42 years old on the alleged onset date. (Tr. 312). She lives in an apartment with her husband. (Tr. 266, 272). She has a master's degree in legal analysis/legal studies. (Tr. 317, 143). Plaintiff has worked since 1991 but there are many years where her earnings were less than $10,000 a year. (Tr. 286). She held low wage jobs such as student worker, administrative worker, and writer. (Tr. 318). From 2007 to 2018, she owned a small craft business dyeing yarn but generally earned an average of $4,000 per year. (Tr. 286, 318).

Plaintiff listed her disabling impairments as fibromyalgia, vertigo, chronic vestibular neuritis, arthritis, degenerative disk disease, PTSD, anxiety, and depression. (Tr. 270). As of November, 2019, plaintiff's medications included Lamictal, Levothyroxine, Gabapentin, Nortriptyline, Provera, Zyrtec, Singulair; and, Albuterol and Dicyclomine as needed (among other over-the-counter medications and supplements). (Tr. 401). She is 5'8" tall and weighed 365 pounds; she is described as morbidly obese in the medical records.

Plaintiff's October 2018 Function Report recounts an inability to do physical work without pain, episodes of dizziness, vertigo, and zoning out, anxious and intrusive thoughts, and pain upon

lying down, sitting down, and standing. (Tr. 363-373). She reports being unable to do any task for more than 15 minutes because of pain or because she becomes distracted and unfocused. (Id.). While she can generally make simple meals, take care of her personal hygiene, drive, manage finances, do housework, shop, and complete some work for her business (when she engaged in her business), she requires breaks, takes extended time completing tasks, and needs help. (Id.).

Plaintiff testified at the January 2020 hearing[3] that when she engaged in her yarn dyeing business, she lifted 15 to 20 pound "pods," sat for 10-20 minutes at a time, and had a sit/stand ratio of 1:1. (Tr. 142). She created this job to manage her own time and how much she worked but she no longer engages in the business. (Tr. 142). She also worked in a friend's yarn shop, mostly part-time, and was able to maintain flexible work hours and flexible sit/stand options. (Tr. 145). She further testified that prior to her onset date, in November, 2017, she worked 6-7 days a week and 60-80 hours a week during Christmas time (presumably in 2016-2017) but drastically cut her yarn and color offerings in the months leading up to her onset date. (Tr. 160-161).

Plaintiff testified that she has a number of conditions that prevent work. She has low back and neck pain that makes lifting difficult and makes her unsteady. (Tr. 146). Her low back pain is constant and is "really bad" 4 times a month. (Tr. 147). Her neck pain radiates through her back and head and causes dizziness, tinnitus, and anxiety – she describes it as an "attack of all my systems." (Tr. 148). She also suffers from dizziness, vertigo, and asthma that prevented her from engaging in her business as did her inability to focus and trouble creating lists. (Tr. 147). She has "classic" migraines that last a few hours and occur twice a month; she treats these with over-the-counter medications and sleep. (Tr. 157-158). She also suffers from "vestibular migraines"

---

[3] The hearing transcript does not contain a date on the cover page; however, there is no dispute that the hearing took place on January 27, 2020 (Tr. 135).

that result in dizziness and can last for 3-4 weeks; there is no treatment for this condition. (Tr. 158).

She was diagnosed with PTSD (post traumatic stress disorder) and is triggered by men with facial hair and stress. (Tr. 151). It causes trouble breathing, focusing, and speaking. (Tr. 151-152). She has OCD (obsessive compulsive disorder) that causes her to conduct hours of research on the internet. (Tr. 159). She has sleep apnea which along with her OCD causes sleeplessness and nightmares. (Tr. 159). Her medications cause her to be sleepy and fatigued. (Tr. 153).

As to her functional limitations, she testified that she can lift 10 to 20 pounds most days but only once and can repeatedly lift 5 to 10 pounds. (Tr. 149). She can stand for less than 10 minutes but needs to move around to alleviate pain from varicose veins. (Tr. 149). She needs to sit down every 15 to 20 minutes and can sit for 45 minutes to an hour. (Tr. 149). She uses a walking stick and can typically walk a slow mile and a half; but she also has days where even a short walk is challenging. (Tr. 149-150).

In a typical day, plaintiff checks her social media accounts, watches TV and knits for an hour or two, attempts to complete a project but usually gets distracted, makes a simple dinner, and then returns to watching TV. (Tr. 154). She also tries to do household chores for 30 minutes to an hour but must take breaks and cannot do it on some days. (Tr. 154). She has good and bad days, bad days last for 4 to 5 days and good days last 3 to 5 days. (Tr. 155). She has left social events because of pain and panic. (Tr. 155). She gets panicked whenever she leaves her home. (Tr. 156).

Vocational expert Delores Gonzalez testified that plaintiff's past work as a small business owner was classified as light and skilled, her work as a dye lab technician was medium and skilled, her work as a writer was sedentary and skilled, and her work as a sale's clerk was light and semi-

skilled.  (Tr. 164).  Ms. Gonzalez was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience who had the following limitations:  can lift up to 20 pounds occasionally, lift, carry up to 10 pounds frequently; can stand and walk for about six hours and sit for up to six hours in an eight hour work day with normal breaks; can occasionally climb ramps or stairs, but never climb ladders, ropes or scaffolds; can never balance as defined by the Dictionary of Occupational Titles; can occasionally stoop, kneel and crouch but never crawl; should avoid exposure to excessive noise which is defined as any noise above moderate; should avoid exposure to irritants such as fumes, odors, dusts, gases and poorly ventilated areas; should avoid exposure to operation controlled moving machinery, unprotected heights and exposure to hazardous machinery; and, should have no interaction with the public and only occasional interaction with coworkers and supervisors.  (Tr. 165).  According to Ms. Gonzalez, such an individual would be able to perform plaintiff's past work as a writer.  (Tr. 165).  In addition, other jobs were available in the national economy, such as mail sorter, price marker, and photocopy machine operator.  (Tr. 166).

Ms. Gonzalez further testified that if the hypothetical were modified to state that the person could lift up to 10 pounds occasionally and walk for 2 hours and sit for up to 6 hours in an 8-hour work day, such a person could still perform plaintiff's past work as a writer.  (Tr. 166).  Moreover, such a person could also perform other jobs in the national economy including addresser, document preparer, and press clippings cutter and paster.  (Tr. 166).   These jobs would also be available if the hypothetical person required a low stress job that would not require fast paced production.  (Tr. 167).

**B.      Medical and Opinion Evidence**

The parties do not dispute the ALJ's findings with respect to plaintiff's physical conditions and diagnoses or the ALJ's conclusions about her severe impairments. Plaintiff does, however, dispute the ALJ's findings as to plaintiff's mental health and its effect on her ability to engage in work.

Plaintiff's primary care physician, Dr. Asim Ali, began treating plaintiff on February 22, 2016 and was her primary care physician through November 16, 2017. (Tr. 475-486). After performing a compressive physical and neurological examination and outlining her medical history (which included hypothyroidism, morbid obesity, asthma, and Fibromyalgia) and medications, Dr. Ali found that she was generally "well-nourished, well developed, alert, in no acute distress" with no abnormal results upon examination. (Tr. 476-479). She was seen by Dr. Ali next on October 4, 2016 with shooting pain in her right leg and treated with pain medication. (Tr. 480). On November 30, 2016, she sought treatment for obesity and recurring leg pain. (Tr. 483).

On November 6, 2017, she followed up with Dr. Ali after she had gone to the emergency room with vertigo with facial paresthesias and nausea. (Tr. 432). At the emergency room, she generally had a normal physical and neurological examination, was in no acute distress, but did appear anxious. The emergency room doctor concluded that "she had an asthma attack and perhaps an anxiety attack earlier but this resolved with albuterol" and prescribed meclizine. (Tr. 437). At her appointment with Dr. Ali, she again appeared normal and denied anxiety. (Tr. 486).

Plaintiff then sought treatment from a variety of sources:[4] Dr. Margaret W. Reiker on December 6, 2017 for general care. (Tr. 487-488); Nurse Kris Scalf on April 4, 2017, May 25,

---

[4] The medical records contain duplications (which are cited) and various coversheets, bills, and other irrelevant material, which are not cited.

2018, and May 31, 2019 for gynecological and general care. (Tr. 514-518; 896-898); Dr. David Curfman on August 20, 2018 for migraine evaluation. (Tr. 524-530); FNP Megan Onder (and other nurses) and an audiologist for dizziness on August 20 and 21, 2018, September 1, 2018, September 13 and 14, 2018. (Tr. 536-566); Dr. Joseph Stauber on August 15, 2019, September 9, 2018 and January 18, 2019 for rheumatology and fibromyalgia. (Tr. 640-648; 792-799); Drs. Amanda O'Brien and Jeffrey D. Harris (Caduceus Corporation) on October 16, 2018 and December 4, 2018 for obstructive sleep apnea. (Tr. 578-580; 775-789); Internal Medical Specialists at BJC Medical Group for a variety of conditions and with a number of providers from November 12, 2018 to November 12, 2019. (Tr. 595-598; 706-771); Physical therapy twice a month from December 20, 2018 to February 18, 2019 and then on June 13, 2019 and September 3, 2019 (Tr. 845-881); Dr. F. Timothy Leonberger on November 16, 2018 for a psychological evaluation. (Tr. 610-614); Dr. David Curfman for migraines on May 6, 2019, November 19, 2022, and November 22, 2019. (Tr. 802-821); Liss & Associates for psychological evaluations from April 3, 2018 to November 21, 2019. (Tr. 617-638; 657-705).[5] The relevant details of these encounters will be addressed below.

Dr. Strauber provided a fibromyalgia medical source statement on December 8, 2019, but was unable to assess plaintiff's functional limitations. (Tr. 826-829). Mr. Gergeceff provided a mental medical source statement on January 13, 2020 that was signed by his supervisor, Dr. Jay Liss. (Tr. 906-910). Mr. Gergeceff indicated that plaintiff has marked limitations in concentration, persistence and pace; that she would be able to perform simple tasks at 21-30% below average; that she had moderate limitations in understanding, remembering, and applying information; that

---

[5] The treatment provider's signature, and some of the text, are unreadable. Defendants note that plaintiff was mostly seen by Jon R. Gergeceff, a licensed clinical social worker and not Dr. Jay Liss, a psychiatrist. Thus, plaintiff's statements about Dr. Liss's findings are inconsistent with the records which demonstrate that a majority of visits were with Mr. Gergeceff.

she had marked limitations in adapting or managing herself; that she had mostly marked limitations in interacting with others; that she can have only casual or infrequent interaction with co-workers and the public and that she could not consistently perform for supervisors; and, that she would miss work three or more times a month because of her psychological conditions. (Id.). He further noted that her symptoms are unpredictable and she is subject to intense bouts of anxiety, she is easily startled and constantly hypervigilant, and she is easily distracted, among other things. (Id.).

### III.  Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that she is disabled under the Act. See Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).  Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also

Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." Id. Stated another way, substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the

Court considers evidence that both supports and detracts from the ALJ's decision.  Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration."  Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)).  Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision."  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The district court must "also take into account whatever in the record fairly detracts from that decision."  Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider).  Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011).  A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance.  Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

### IV.  The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above.  (Tr. 49-69).  The ALJ found that plaintiff met the insured status requirements through March 31, 2022, and had not engaged in substantial gainful activity since November 3, 2017, the alleged onset date.

(Tr. 51). At step two, the ALJ found that plaintiff had the severe impairments of obesity, degenerative disc disease in cervical and thoracic spine, mild degenerative disc disease in lumbar spine, post-traumatic stress disorder, anxiety, nonintractable episodic headache, obstructive sleep apnea, Fibromyalgia, and asthma. (Tr. 53).

The ALJ determined at step three that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (Tr. 53). The ALJ specifically addressed listing 14.09D (inflammatory arthritis) and 11.02 (epilepsy), the most closely analogous listings to fibromyalgia and headaches, respectively. (Tr. 54). He also considered analogous listings to obstructive sleep apnea including listing 3.09 (chronic pulmonary hypertension), 4.02 (chronic heart failure), 12.02 (disturbances in mood, cognition, and behavior). (Tr. 55). And he considered listing 3.03 (asthma), 12.06 (anxiety) and 12.15 (trauma-related disorders). (Tr. 55-56). Plaintiff does not challenge the ALJ's assessment of her severe impairments or his determination that plaintiff's impairments do not meet or equal a listing.

The ALJ next determined that plaintiff had the RFC to perform sedentary work, except that she could lift up to ten pounds occasionally. She can stand/walk for about two hours and sit for up to six hours in an eight-hour work day, with normal breaks. She can occasionally climb ramps or stairs, but never climb ladders, ropes or scaffolds. She can never balance as defined by the Dictionary of Occupational Titles. She can occasionally stoop, kneel and crouch, but never crawl. She should avoid exposure to excessive noise, which is defined as any noise above moderate. She should avoid exposure to irritants such as fumes, odors, dust, gases and poorly ventilated areas. She should avoid exposure to operational control of moving machinery, unprotected heights and exposure to hazardous machinery. Her work should be in a low stress job, defined as having only occasional changes in the work setting. Her work should not be in a fast-paced production type of

job. She should have no interaction with the public. And, she should have only occasional interaction with co-workers and supervisors. (Tr. 56-57). In assessing plaintiff's RFC, the ALJ summarized the medical record; written reports from plaintiff; plaintiff's work history; and plaintiff's testimony regarding her abilities, conditions, and activities of daily living. (Tr. 57-66). Plaintiff asserts that the ALJ improperly assessed her subjective complaints and that the RFC is not supported by substantial evidence.

At step four, the ALJ concluded that plaintiff was unable to return to any past relevant work. (Tr. 67). Her age on the alleged onset date placed her in the "younger individual" category. She had at least a high school education. (Id.) The transferability of job skills was not an issue because using the Medical-Vocational Rules as a framework supported a finding that plaintiff was not disabled whether or not she had transferable job skills. The ALJ found at step five that someone with plaintiff's age, education, work experience, and residual functional capacity could perform other work that existed in substantial numbers in the national economy, namely as an addresser, document preparer, and press clippings cutter and paster. (Tr. 67-68). Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act from November 3, 2017 to March 30, 2020 — the date of the decision. (Tr. 68-69).

## V. Discussion

Plaintiff argues that (1) the ALJ failed to properly evaluate her pain and subjective complaints; and (2) the ALJ failed to give appropriate weight to her treating psychiatrist's and therapist's opinion. Plaintiff's second argument will be addressed first.

### A.     Weight given to Treating Psychiatrist's and Therapist's Opinion

When evaluating opinion evidence, an ALJ no longer is required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior

administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a).[6] Rather, in evaluating medical sources, the ALJ considers specific factors including supportability, consistency, relationship with the claimant, specialization, and other factors. Id. at (b)(2), (c)(1-5). The first two, supportability and consistency, are the most important factors. Id.

Plaintiff argues that the ALJ erred in finding Dr. Liss' and counselor Gergeceff's opinions, that plaintiff has marked and significant limitations because of her mental state, unsupported and inconsistent because he only relied on "one psychotherapy note in April of 2019 that indicates plaintiff was 'doing well'" instead of the entirety of the treatment notes (Doc. 28, p. 13). In evaluating supportability, "the more relevant the objective medical evidence and supporting explanations presented" the more persuasive the opinion will be. 20 C.F.R. 404.1520c(c)(1). And, "the more consistent a medical opinion . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive" the medical opinion can be. Id. at (c)(2).

In evaluating these treating health providers, the ALJ stated that:

> While this opinion [by Dr. Liss and counselor Gergeceff] is supported by a report regarding the claimant stating things such as the claimant was easily startled, hypervigilant and could isolate herself, it is not consistent with other psychotherapy notes, which included a statement that the claimant was doing well in April 2019 (Exhibit 20F/3). This opinion is not consistent with a psychiatric exam, which showed that her mood appeared anxious and depressed. She expressed impulsivity. However, cognition and memory were normal. She did not express inappropriate judgment and she was attentive (Exhibit 14F/1-2). Furthermore, this opinion is not consistent with a mental status exam by a neurologist, which showed that the claimant was awake and alert. Speech was normal. Language was fluent with no aphasia. Attention and concentration were normal (Exhibit 24F/3). Accordingly, the undersigned finds that this opinion is not persuasive.

(Tr. 66).

---

[6] For claims filed prior to March 27, 2017, regulations require that more weight be given to the opinions of treating physicians than other sources. 20 C.F.R. § 404.1527(c)(2)

Thus, the ALJ did note their findings, based on plaintiff's reporting, that she is easily startled, hypervigilant, etc., and also discussed their other findings and notes throughout his opinion. (Tr. 61-65, referring to Exhibit 20F). In discounting these providers' opinion the ALJ relied on Mr. Gergeceff April 5, 2019 note stating that plaintiff was doing well. The ALJ also relied on other evidence in the record. This evidence includes Dr. Howard's November 12, 2018, treatment note that she was anxious, expressed impulsivity, and a depressed mood, but appeared alert with normal cognition, memory, attentiveness, and not inappropriate judgment. (Tr. 596). And, Dr. Curfman's November 22, 2019 office visit note stated that she was "[a]wake and alert. Speech is normal. Language is fluent with no aphasia. Attention and concentration are normal." (Tr. 803). These evaluations can reasonably be considered to be inconsistent with the marked limitations in functioning proposed by Mr. Gergeceff and Dr. Liss.

Moreover, the ALJ found that plaintiff had more than just a mild impairment in the ability to interact with others when he discussed Dr. Leonberger's November, 2018 assessment. (Tr. 65). Dr. Leonberger opined that she only had a mild impairment in interacting with others because she was "quite comfortable" talking to him, she was "clear and detailed" in describing her symptoms, she did not appear unusually anxious, and she reported regular contact with friends, going outside her house with her husband, and visiting antique malls. (Tr. 614). The ALJ found that Dr. Leonberger's assessment was partially persuasive becuase she had more than a mild impairment in interacting with others because other medical records found her to be anxious and depressed. (Tr. 746; note from BJC Medical Group, Internal Medicine from December 28, 2018). Finally, as the defendant points out, the medical record is replete with instances where plaintiff appeared alert and cooperative, oriented and with a normal mood. (Doc. 33, pp. 8-9; Tr. 433, 488, 526-7, 612-3, 641, 645, 718, 724, 734, 748, 781, 803).

Far from being "remote and random" and "cherry-picked" (Doc. 28, p. 14), the record as a whole reveals that while plaintiff did suffer from mental impairments that would affect her ability to work, including anxiety and depression with related inattentiveness and impulsivity, those impairments were not so severe as to generate the marked and moderate areas of functioning in Mr. Gergeceff's opinion.

B.  **Assessment of Pain and Subjective Complaints**

When determining a claimant's RFC, the ALJ must evaluate the credibility of the claimant's subjective complaints.[7] Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005). In doing so, the ALJ must consider the claimant's prior work record and third-party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Halverson v. Astrue, 600 F.3d 922, 931 (8th Cir. 2010); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ is not mechanically obligated to discuss each of the above factors, however, when rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination detailing his or her reasons for discrediting the testimony, and the ALJ's credibility assessment must be based on substantial evidence. Vick v. Saul, No. 1:19 CV 232 CDP, 2021 WL 663105, at *8 (E.D. Mo. Feb. 19, 2021) (citing Renstrom v. Astrue, 680 F.3d 1057, 1066 (8th Cir. 2012); Grba-Craghead v. Astrue, 669 F. Supp. 2d 991, 1008 (E.D. Mo. 2009)). On review by the court, "[c]redibility determinations are the province of the ALJ." Nash v. Comm'r, Soc. Sec. Admin., 907 F.3d 1086, 1090 (8th Cir. 2018) (quoting Julin v. Colvin, 826 F.3d 1082, 1086 (8th Cir. 2016)).

---

[7] Social Security Ruling 16-3p eliminated the term "credibility" from the analysis of subjective complaints. However, the regulations remain unchanged; "Our regulations on evaluating symptoms are unchanged." SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017); 20 C.F.R. §§ 404.1529, 416.929.

The court defers to the ALJ's determinations "as long as good reasons and substantial evidence support the ALJ's evaluation of credibility." Id.

Here, the ALJ determined that, although plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements regarding the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 64). The Court finds that the ALJ appropriately considered plaintiff's allegations of disabling pain and other limitations based on the objective medical evidence and plaintiff's ability to perform activities of daily living. The Court further finds that to the extent the ALJ found that plaintiff had limitations, these were accounted for in the RFC and the hypothetical proposed to the vocational expert.

Plaintiff testified that she experiences neck, back, joint and hip pain that is disabling. (Tr. 58-59, 146-148). She also testified to vertigo, dizziness, asthma, tinnitus, headaches, and migraines (Tr. 146-147). She further testified to mental limitations that cause lack of focus, anxiety, panic, fuzzy vision, aphasia (Tr. 151-152, 155-156), fatigue with medication, (Tr. 153), and stretches of bad days. (Tr. 155). Plaintiff testified about her daily activities and the effect of medication. In his opinion, ALJ set forth plaintiff's testimony and considered it within the context of her medical records. Thus, the ALJ did not simply ignore plaintiff's own statements of her disabling conditions. Indeed, the ALJ took into account plaintiff's statements when fashioning the RFC.

Plaintiff pinpoints various pieces of evidence to demonstrate her disabling conditions and the ALJ's failure to consider them conclusive. For example, she states that Dr. Stauber found a reduced range of motion and that her conditions were working against each other, thus exacerbating her condition. (Doc. 28, p. 10). While Dr. Stauber did report her "severe vertigo,"

and possible vestibular migraines, he also noted that "vestibular testing and MRI where [sic] negative with ENT." (Tr. 646). He further diagnosed her with fibromyalgia but did not prescribe new medication and instead recommended "non-pharmacologic treatment, sleep hygiene, exercise, OSA, Diet/weight loss" and directed follow up appointments with neurology and psychiatry. (Tr. 646). This assessment and treatment plan was virtually identical in the next two visits on January 18, 2019 and August 15, 2019 – a demonstration that her conditions did not get significantly worse or that additional intervention was required. (Tr. 642, 795). As the ALJ pointed out, Dr. Stauber's opinion as to her functional limitations were inconsistent with Dr. Curfman's generally normal neurological examination of plaintiff on August 8, 2019. In that examination, Dr. Curfman found that her cranial nerves were normal, motor function was normal with occasional pain, sensory function was normal, reflexes were normal, coordination was normal, gait was normal, and she was well developed. (Tr. 526-7). Like Dr. Stauber, Dr. Curfman recommended lifestyle changes to reduce headache risks and directed an MRI, which Dr. Stauber noted was normal. (Tr. 528). Thus, the ALJ did consider Dr. Stauber's assessment but found that it was inconsistent with Dr. Curfman's diagnostic testing and assessments. See Swarthout v. Kijakazi, 35 F.4th 608, 611 (8th Cir. 2022) (holding that an ALJ may discount a treating doctor's assessment if it is a check-box format and inconsistent with the record).

      Moreover, as pointed out by defendant, plaintiff underwent various testing that almost uniformly generated normal results including the aforementioned MRI, rheumatology testing (Tr. 60, 595, 797), back x-rays (Tr. 58-59, 797), chest x-ray (Tr. 436), audiogram (Tr. 536), and comprehensive ENT exam (Tr. 538-539). And, as the ALJ points out throughout his opinion, a majority of plaintiff's numerous interactions with medical professionals revealed normal physical examinations (Tr. 437, 486, 488, 514, 517,724), normal cognition, mood and affect (Tr. 488, 517,

527, 724), normal attention and concentration (Tr. 526-28), and normal neurological examinations (Tr. 526-28), to cite a few. Swarthout, 35 F.4th at 611-612. The ALJ also noted abnormal findings; worsening headaches (Tr. 59), positive trigger points related to fibromyalgia (Tr. 59, 62), decreased range of motion and tenderness, anxiety, and depressed mood (Tr. 60). But, the ALJ found that in January, 2019, she stated she had been feeling better than she had in a year and while her symptoms had not disappeared, she felt stronger, was cooperative and had normal examinations (Tr. 61). Moreover, she reported a good therapist, a treatment protocol that would lead to improvement, and was directed to continue making lifestyle changes. (Tr. 61-62 – referring to Dr. Stauber's assessment). In May, 2019, Dr. Curfman also stated that she was doing better even though her symptoms had not resolved. (Tr. 806).[8]

Thus, when coupled with plaintiff's statements of daily living, including driving, checking social media accounts, knitting for an hour or two a day, cooking, reading, 30 minutes of chores, shopping, seeing friends regularly, and walking, the medical evidence does not reveal the severe limitations set forth by Mr. Gergeceff and plaintiff's own assessment of what she can and cannot do.[9] And, the ALJ took into account plaintiff's functional limitations in crafting a restrictive RFC that limited plaintiff to sedentary, non-stressful work, with limited interaction with others, no exposure to fumes and gasses, work in a well-ventilated area, and lifting up to 10 pounds

---

[8] Plaintiff's argument regarding temporary improvement of symptoms is not applicable to this matter because it concerns continued entitlement to benefits, not an initial assessment. See 20 C.F.R. 404.1594 entitled "How we will determine whether your disability continues or ends."

[9] Plaintiff cites to Hogg v. Shalala, 45 F.3d 276, 278-9 (8th Cir. 1995), for the proposition that plaintiff's activities do not demonstrate an ability to perform full-time work. In that case, the Court of Appeals indicated that it "has repeatedly stated that the ability to do activities such as light housework and visiting with friends provides little to no support" that the claimant can work. In that case, however, the claimant asserted a disability based on borderline intelligence with a developmental age of 8 to 11. This certainly is not the case here – plaintiff has a master's degree and there is no suggestion that she is similarly mentally impaired.

occasionally. Plaintiff has failed to establish that the ALJ improperly evaluated her subjective complaints.

\* \* \* \* \*

For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

*/s/ John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 14th day of July, 2022.